UNITED STATES, Appellee,

v.

Howard C. LEVITE, Specialist Four,
U.S. Army, Appellant.

No. 54,954.
CM 447749.

U.S. Court of Military Appeals.

Dec. 21, 1987.

For Appellant: *Captain Richard J. Anderson* (argued); *Colonel Brooks B. LaGrua, Lieutenant Colonel Paul J. Luedtke* and *Major Dale K. Marvin* (on brief).

For Appellee: *Captain Samuel J. Rob* (argued); *Colonel Norman G. Cooper* and *Lieutenant Colonel Gary F. Roberson* (on brief).

OPINION OF THE COURT

SULLIVAN, Judge:

On June 24 and 25, 1985, appellant was tried by a general court-martial composed

of officer and enlisted members at Stuttgart, Federal Republic of Germany. Contrary to his pleas, he was found guilty of escape from custody, wrongful distribution of marijuana on two separate occasions, and wrongful possession of marijuana with intent to distribute, 'in violation of Articles 95 and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 895 and 912a, respectively. He was sentenced to a dishonorable discharge, total forfeitures for 10 years, and 10 years' confinement. The convening authority approved the sentence as adjudged but reduced the confinement to 5 years.[1] On March 27, 1986, the Court of Military Review affirmed the findings and sentence in a short-form opinion.

This Court specified the following issue for review:

## A

WHETHER OTHER ACTIONS IMPEDING A COURT–MARTIAL IN VIOLATION OF ARTICLE 98, UNIFORM CODE OF MILITARY JUSTICE, 10 U.S.C. § 898, OR VIOLATIVE OF AN ACCUSED'S RIGHT TO GATHER EVIDENCE IN VIOLATION OF ARTICLE 46, UCMJ, 10 U.S.C. § 846, BUT NOT COMMITTED BY AN OFFICER EMPOWERED TO CONVENE COURTS–MARTIAL, AMOUNT TO UNLAWFUL COMMAND INFLUENCE UNDER ARTICLE 37, UCMJ, 10 U.S.C. § 837.

## B

IF SUCH ACTS DO AMOUNT TO UNLAWFUL COMMAND INFLUENCE, MUST AN ACCUSED DEMONSTRATE ACTUAL PREJUDICE TO WARRANT APPELLATE REVERSAL OR SHOULD THE DOCTRINE OF GENERAL PREJUDICE APPLY?

We hold that unlawful command influence proscribed by Article 37, 10 U.S.C.A. § 837 was clearly established in this case and, on the basis of this record, reversal of the findings and sentence is required. *Cf. United States v. Thomas,* 22 M.J. 388 (C.M.A.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

On appeal, neither party disputes the facts developed by an informal investigation conducted pursuant to Army Regulation (AR) 15–6 (C 1, June 15, 1981) of the events surrounding this court-martial and other complaints.[2] This post-trial investigation developed the following information.

Prior to appellant's trial, the 198th Personnel Service Company of the 38th Personnel and Administration Battalion, stationed at Nellingen Barracks, Federal Republic of Germany, was assembled for a unit meeting. Sergeant Major James L. Mulheron called this meeting due to a perceived schism between the enlisted unit members and the command structure of this company. He earlier asked for and received permission from Captain Patricia D. Rainey, the Nellingen Composite Team Commander, to hold such a meeting and

1. The action of the convening authority states that "forfeiture of all pay and allowances" is approved by the convening authority despite the fact that appellant was only sentenced to "forfeit all pay and allowances for 10 'years" (R. 362).

2. An AR 15–6 investigation was ordered by Brigadier General Richard G. Cardillo, USA, Chief of Staff, VII Corps. It directed an investigation into equal opportunity complaints by an officer and enlisted person. As part of this inquiry, the investigating officer was to inquire:

 i. After the Levite court-martial were any witnesses called into the Battalion Command Sergeant Major's office or the company 1SG's office and counseled with respect to their testimony on behalf of the accused?

 (1) What was the substance of such counseling if it took place?

 (2) Who was present and approved it?

 (3) What effect, if any, did it have on the Levite court-martial?

 (4) What effect, if any, might it have on future courts-martial from the same battalion?

 (5) Specifically, was Sergeant Cobb threatened to be removed from the E–7 list because of testifying on behalf of Private Levite?

 j. Did Sergeant Mulheron indicate that the soldiers who associated with Levite were streetwalkers?

 k. Did he ever indicate to one member of the unit that she dressed like a "French whore"?

 l. Was Private Levite denied access to CPT Gaines as the IG by MAJ Madden or MAJ Flint?

appellant's servicemember information file (SMIF) was disclosed at that time to the assembled unit.[3] He stated his purpose was to explain "that the orderly room" had not unjustly prosecuted appellant. During this unit meeting, some contents of the file were displayed, and information allegedly showing appellant's "bad character" was made known to the unit. Additionally, Sergeant Major Mulheron voiced his opinion that appellant possibly was involved in the pandering of two female members of the unit.

Neither PFC Fowler nor PFC Hemsworth, the two female members referred to above, was present at the meeting. Sergeant Major Mulheron later called them into his office to discuss their relationships with appellant. He again stated his opinion that appellant was "pimping" them and told them that their off-duty clothing and makeup preferences made him think that they looked "French." He also displayed some pictures from appellant's SMIF file to the two soldiers at this meeting. This meeting was witnessed by Staff Sergeant Hazel E. Thompson in accordance with an earlier arrangement made by Sergeant Major Mulheron.

At some point after this meeting, PFC Fowler attended a meeting, on an unrelated matter, with Major Everett I. Madden, company commander of the 198th PSC, Sergeant Major Mulheron, and Captain Rainey. At this meeting, Major Madden criticized PFC Fowler for associating with appellant and discussed his views on appellant's guilt. PFC Fowler stated that it was her impression that Major Madden did not want her to testify on appellant's behalf. PFC Fowler later testified at appellant's court-martial as a defense witness on the merits.

Three or four days before trial, Major Stephen R. Haney, trial counsel, informed the first sergeant of this company, Master Sergeant Kenneth G. Williams, that Staff Sergeants Hall, Vinson and Cobb were scheduled to testify on behalf of appellant. Major Madden then asked trial counsel whether he could show appellant's SMIF to the staff sergeants. Major Haney replied that Major Madden was permitted to show the file, but he could not order the sergeants to view it. Upon receiving this advice, Major Madden directed First Sergeant Williams to have the three staff sergeants report to the orderly room, whereupon he asked them to review appellant's SMIF "so that they would be current in their testimony." Hall subsequently testified for the defense on the merits and on sentence, while Cobb and Vinson testified on sentencing.

The final pretrial activity which occurred was Captain Leslie L. Beckstrom's decision not to testify as expected. Defense counsel expected Captain Beckstrom to offer evidence regarding "the bad character for honesty of" a government witness. However, she later stated to trial counsel that she had no basis for this opinion. Defense counsel, however, asserted she told him she had "several bases" for her opinion. She was absent from the trial, and no stipulation was reached concerning her testimony. The AR 15–6 investigation further shows that Captain Beckstrom was counseled by the battalion commander, Lieutenant Colonel Patricia P. Hickerson, and Major Madden, on another matter.

At trial, Major Madden, Command Sergeant Major Robert E. Newborn, Sergeant Major Mulheron, and First Sergeant Williams sat as spectators. Major Madden remained in the courtroom after testifying to observe Staff Sergeant Hall and Staff Sergeant Vinson testify. Staff Sergeant Hall later stated that Sergeant First Class James M. Hines told her during the trial that First Sergeant Williams "was ranting and raving" in the hallway outside the courtroom about noncommissioned officers

---

**3.** The record indicates this file was locally called a "Smith" file, and it was maintained at the company level on about 25 percent of the soldiers in this company. This file contained "letters of indebtedness, counseling statements and other ... derogatory information," including mere accusations. It also contained "positive information." This file apparently was not expressly authorized by service regulations.

condoning use of drugs by the troops "because... [the NCOs] smoke it with them." Moreover, Staff Sergeant Vinson later stated that "Major Madden and First Sergeant Williams gave" him "strange looks" in the courtroom while he was testifying on behalf of appellant.

Also, Staff Sergeant Darryl D. LaBorn, who was expected to testify on behalf of appellant at sentencing, did not attend the court-martial and could not be located during the trial. A stipulation of testimony was used instead. When questioned during the subsequent investigation, Staff Sergeant LaBorn did not state his reasons for failing to give his expected testimony. Rather, he stated that he had experienced many problems with Major Madden after a previous episode where he had testified favorably for a soldier whom Major Madden desired to remove from military service.

The day after appellant's trial, First Sergeant Williams held a unit formation which included the staff sergeants who had testified for appellant. First Sergeant Williams had a dictionary, a Manual for Courts-Martial, and a copy of the enlisted oath. He stated that some people did not know what the word "good" means, emphasized the illegality of appellant's drug offenses, and informed the formation of appellant's sentence. After the formation, Major Madden, Sergeant Major Mulheron, and First Sergeant Williams jointly conducted individual counseling sessions for Staff Sergeant Hall, Staff Sergeant Vinson, and Staff Sergeant Cobb because Major Madden "was shocked" that these noncommissioned officers would still testify favorably for appellant, having already reviewed appellant's SMIF. The shock may have been induced by the fact that Staff Sergeant Hall had indicated in her pretrial meeting with Master Sergeant Williams "that she did not want to" testify for appellant. Major Madden informed the staff sergeants "that they had embarrassed the" unit, and he indicated that they should have based their opinions of appellant's "potential for rehabilitation" on more than mere work performance. Major Madden further stated to

Vinson that Madden could not believe that the NCOs would testify favorably for a convicted drug offender and that their testimony was "unprofessional." Due to evidence of perjury at this trial, Staff Sergeant Cobb was later reduced to Specialist Five by field-grade nonjudicial punishment under Article 15, UCMJ, 10 U.S.C. § 815, issued by Lieutenant Colonel Hickerson.

Chief Warrant Officer Paul D. Price, who witnessed the counseling sessions for Staff Sergeant Hall and Staff Sergeant Vinson, stated at the investigation that "the average soldier would be reluctant to testify in" future courts-martial after a "counseling session" such as these. Moreover, Staff Sergeant Vinson stated that he would not be surprised if "something negative" happened to him as a result of testifying on appellant's behalf.

From July 9 to 22, 1985, an investigation was conducted pursuant to AR 15–6 to determine, *inter alia*, whether unlawful command influence was exercised in appellant's trial. Major Joseph A. Russelburg, a military judge, was the investigating officer. The initial staff judge advocate recommendation prepared by Colonel Barry P. Steinberg and dated August 19, 1985, recommended approval of the sentence which included ten years' confinement as adjudged. When defense counsel initially received a copy of this report, the investigating officer's findings, conclusions, and recommendations as well as the 49 exhibits— were not included. Upon demand for the full record, defense counsel received copies of the exhibits indicated in the report but did not receive the investigating officer's findings, conclusions, or recommendations. Finally, following defense counsel's request to include the entire AR 15–6 investigation, including the findings, conclusions, and recommendations as part of the record of trial, Colonel Steinberg submitted the following addendum to his recommendation on September 20, 1985:

1. On 12 September 1985, this office received from the individual trial Defense Counsel a response, pursuant to

R.C.M. 1105 and R.C.M. 1106, to my Recommendation dated 18 September 1984 [sic] and service of the authenticated record of trial.

2. At the request of the trial Defense Counsel, the exhibits from the AR 15–6 investigation are enclosed with the previously enclosed testimony.

3. In my opinion the accused suffered no prejudice at his trial because of the actions of the unit commander toward the three defense witnesses. However, in an abundance of caution and to ensure that the accused's trial is totally free from even the appearance of unfairness, I recommend you reduce the confinement from 10 to five years.

The actions of the officers and the enlisted persons in appellant's command reflect fear that he would not be found guilty or be properly punished by a court-martial. Succumbing to this fear, they attempted to influence this court-martial by taking steps to ensure that appellant would be convicted and severely punished. Such desperate action, albeit clothed in a concern for military professionalism, constituted a serious breach of good order and discipline within this command. *See United States v. Karlson*, 16 M.J. 469, 474 (C.M.A.1983); *United States v. Olson*, 11 U.S.C.M.A. 286, 289, 29 C.M.R. 102, 105 (1960). Furthermore, it was patently unlawful (*see* Art. 37) and provides a possible basis for bringing criminal charges against these servicemembers (Art. 98, 10 U.S.C.A. § 898). *See* Arts. 80 and 81, UCMJ, 10 U.S.C. §§ 880 and 881, respectively.

The Government on appeal does not dispute the unlawfulness of these actions. Instead, it asserts that the record does not show that appellant's court-martial was actually influenced by them; but that in any event, the remedial action by the convening authority was sufficient to cure "any possible prejudice." We disagree on both counts and, accordingly, order a rehearing.

In the recent decision of this Court in *United States v. Thomas, supra* at 394, Chief Judge Everett, speaking for the Court, stated the following standard for remedial action in cases involving unlawful command influence:

Consequently, in cases where unlawful command influence has been exercised, no reviewing court may properly affirm findings and sentence *unless it is persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence.*

(Emphasis added.) Again speaking for the Court, the Chief Judge also cautioned military commanders that this Court and others would not tolerate laxity in this matter, stating:

A primary responsibility of this Court in its role as civilian overseer for the military justice system is to ensure that commanders perform their military-justice responsibilities properly and that they are provided adequate guidance by their legal advisors in performing those responsibilities. Merely remedying the error in the cases before us is not enough. Instead, we wish to make it clear that incidents of illegal command influence simply must not recur in other commands in the future.

Recognizing that military commanders and judge advocates usually exert themselves in every way to comply with both the spirit and the letter of the law, we are confident that events like those involved here will not be repeated. *However, if we have erred in this expectation, this Court—and undoubtedly other tribunals—will find it necessary to consider much more drastic remedies. Id.* at 400 (emphasis added).

This long held expectation of the Court has not been met in this case, and the commands of the Constitution and the Code were clearly flouted. *See generally Cooke v. Orser*, 12 M.J. 335, 338 (C.M.A.1982).

 The first granted issue essentially asks whether this standard for reversal applies when command personnel other than convening authorities engage in such unlawful action. Clearly it does. The

plain language of Article 37,[4] its legislative history,[5] and our previous decisions [6] applying it have included such persons within its purview. Moreover, the Government itself concedes that such conduct is prohibited by the Due Process Clause of the Constitution and other codal provisions, even if not included within the technical confines of Article 37. *See generally* U.S. Const. amend. V, and Art. 46, 10 U.S.C.A. § 846, and Art. 98. We hold that the acts of the command personnel in this case were unlawful command influence prohibited by Article 37. Accordingly, the same test for prejudice will be applied.

■ The second question we must answer is whether the findings and sentence in this case should be reversed under this standard. The Government initially asserts that the command's attempt to influence the court-martial failed and that the record shows beyond a reasonable doubt that the findings and sentence were not affected. We do not share this conclusion and instead hold that the Government has not shown beyond a reasonable doubt that such error was harmless. *United States v. Thomas, supra.*

**4.** § 837. Art. 37. Unlawfully influencing action of court

(a) No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercises of its or his functions in the conduct of the proceedings. *No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.* The foregoing provisions of the subsection shall not apply with respect to (1) general instructional or informational courses in military justice if such courses are designed solely for the purpose of instructing members of a command in the substantive and procedural aspects of courts-martial, or (2) to statements and instructions given in open court by the military judge, president of a special court-martial, or counsel.

We first note that a post-trial hearing similar to that ordered in *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967), was not conducted in this case. In such a proceeding, appellant would be represented by counsel, have an opportunity to cross-examine witnesses, have findings of facts and conclusions of law entered on the command-influence issue, and have a verbatim record of the proceedings. An informal administrative investigation (the findings, conclusions, and recommendations of which are not included in the record before us) is an inadequate substitute. In other words, the extent of the command influence exercised in this case and its impact on appellant's court-martial have not been fully developed in this record. *See United States v. Karlson,* 16 M.J. at 474.

Second, we find that the command lectures on the concept of the "total soldier" and briefings on appellant's alleged background as a panderer and a knife-wielding assailant polluted the environment in which his trial was held. Word travels fast in the military, and these actions, in view of their specificity and content, were so damaging as to render remote the possibility of a fair trial at that time. *United States v. Brice,* 19 M.J. 170, 172 (C.M.A.1985). *See* Mil.R.

(Emphasis added.)

**5.** *See* Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcomm. of the House Committee on Armed Services, 81st Cong., 1st Sess. 1019–21 (1949); H.R.Rep. No. 491, 81st Cong., 1st Sess. 7–8, 21 (1949); S.Rep. No. 486, 81st Cong., 1st Sess. 6, 17 (1949); *see also* Report of War Department Advisory Committee on Military Justice To The Secretary of War (Vanderbilt Report) 6–8 (December 13, 1946).

**6.** *E.g., United States v. Miller,* 19 M.J. 159 (C.M.A.1985) (company commander); *United States v. Rosser,* 6 M.J. 267 (C.M.A.1979) (company commander); *United States v. Olson,* 11 U.S.C.M.A. 286, 29 C.M.R. 102 (1960) (Deputy Chief of Staff for Personnel and president of the court); *United States v. Navarre,* 5 U.S.C.M.A. 32, 17 C.M.R. 32 (1954) (Commander of Kokura General Depot); *United States v. Isbell,* 3 U.S.C.M.A. 782, 14 C.M.R. 200 (1954) (Commanding General, U.S. Army, Europe and Division SJA); *United States v. Littrice,* 3 U.S.C.M.A. 487, 13 C.M.R. 43 (1953) (acting group commander).

Evid. 404 and 403, Manual for Courts-Martial, United States, 1984. Without an informed voir dire of the members, we cannot be sure appellant's case was presented to an untainted court.

Third, the tampering with witnesses for the defense both before and during trial was not shown to be harmless to appellant. *United States v. Rosser*, 6 M.J. 267, 271–72 (C.M.A.1979). Two expected witnesses on the merits (Hall and Beckstrom) were subjected to this command intimidation, and the court-martial never heard the testimony of one of them. Four sentencing witnesses (Cobb, Hall, Vinson, LaBorn) were also exposed to pressure, and the court-martial was forced to hear the testimony of one of them by stipulation. The remainder of the defense witnesses all testified under the glare of the commander and his minions. The purportedly favorable or cumulative nature of some of this testimony does not persuade us to the contrary where a proper record has not been developed.

Fourth, no purging action was taken by the Court of Military Review, as was done in *United States v. Thomas, supra.* The findings, recommendations, and follow-up action at the command level have not been presented to this Court. Moreover, the post-trial efforts of this command to influence future courts-martial exacerbate the problem. The true impact of these corrosive efforts has yet to be seen and calls for the drastic measures intimated by the Court in *United States v. Thomas, supra.*

■ Turning to the Government's alternative argument, we find that the remedial action taken by the convening authority was not sufficient to make the command influence exercised in this case harmless. It was grudgingly recommended by his staff judge advocate only after a request from defense counsel that the findings and recommendations of the investigating officer be attached to this record of trial. Furthermore, the staff judge advocate's summary resolution of the prejudice question is completely unacceptable, in view of the incomplete investigation and the information disclosed therein. Our concern is with a fair court-martial, not a gratuitous grant of clemency which tends to obfuscate the problem of command influence.

In summary, the command influence exercised in this case was as pervasive as it was pernicious. Every effort was made by the command to ensure that the court-martial convicted and punished appellant in accord with its will. Concern for the commands of the Constitution, the Code, and the President was nonexistent. *See* R.C.M. 104(a)(2), Manual, *supra.* Upon discovery of this fraud on the court, insufficient effort was expended to root out its cause and nullify its effect. *Cf. United States v. Thomas, supra.* We have no confidence as a matter of law in this verdict, and it must be overturned.

The decision of the United States Army Court of Military Review is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge EVERETT concurs.

COX, Judge (concurring):

The second part of the specified issue requires us to consider if an accused "must ... demonstrate actual prejudice to warrant appellate reversal or should the doctrine of general prejudice apply?" Although specified by this Court, we have not answered the question here. Likewise, we did not answer the question in *United States v. Cruz*, 25 M.J. 326 (C.M.A.1987), even though it was the central theme of the opinion below [*see United States v. Cruz*, 20 M.J. 873 (A.C.M.R.1985) (en banc)]; and we did not answer it in *United States v. Kitts*, 23 M.J. 105 (C.M.A.1986), or *United States v. Thomas*, 22 M.J. 388 (C.M.A.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). This might cause a person to wonder, "Why doesn't the United States Court of Military Appeals answer this question?" Perhaps I speak only for myself, but I don't believe the question needs to be answered.

First, no one disputes the fact that "[c]ommand influence is the mortal enemy of military justice." *United States v. Thomas, supra* at 393. Second, unlawful command influence is itself prohibited by the Uniform Code of Military Justice, and one who engages therein is subject to criminal charges under the Code. Arts. 37 and 98, UCMJ, 10 U.S.C. §§ 837 and 898, respectively. If this Court senses the existence of command influence lurking in the record of trial or allied papers of a court-martial, we shall go to extraordinary lengths to be certain "beyond a reasonable doubt" that neither the findings nor the sentence have been tainted by command influence. *United States v. Thomas, supra* at 394.

Having said this, nothing I have read, seen, heard, or experienced convinces me that an appellant who claims his trial has been unlawfully influenced by a commander is—or should be—relieved of a litigant's obligation in an adversarial proceeding to assert the facts of his allegation with sufficient particularity and substantiation so that, if true, any reasonable person can only conclude that unlawful command influence does indeed exist. An appellant who claims his court-martial has been unlawfully influenced had better declare and show that the proceedings were unfair and that the proximate cause of the unfairness resulted from unlawful command influence. If no causal connection between command influence and the injury (*i.e.*, the "unfair trial") appears, then an accused is not entitled to relief. This is the basic premise upon which the findings were upheld in the so-called "Third Armored Division" cases. *United States v. Thomas, supra* at 397–99. In *Thomas*, it is recalled, there was no allegation or evidence of a causal connec-tion between the unlawful influence and the guilty pleas.

The unfortunate aspect of the debate is that we, as lawyers, tend to reach an impasse on the legal technicalities of the matter. Who has the burden of proof? Who has the initial "burden of persuasion"? This Court has not and, in my judgment, should not even attempt to assign these burdens. Certainly an appellant's unsubstantiated assertion that unlawful command influence exists is not going anywhere, and relief will not be granted if the court-martial has not been unlawfully influenced. Generally speaking, the accused is the one who must come forth with proof. On the other hand, it may be that trial counsel, the staff judge advocate, or someone else has the ethical and legal duty to come forward and reveal the existence of unlawful command influence; but each case must be considered on its own facts.

As far as I am concerned, the bottom line is this: If an accused or appellant alleges sufficient facts which, if true, constitute unlawful command influence, and asserts how this unlawful conduct "influenced" the outcome of his trial, I am going to look into the matter. Unless I am convinced beyond a reasonable doubt that he received a fair and impartial court-martial and that the outcome of the trial was not unlawfully influenced, he or she is going to get my vote for relief.

In this case, considering the shenanigans that were going on in this appellant's unit, I am not convinced that the court-martial proceedings were fair and impartial. Accordingly, I concur with my Brothers in reversing the decision of the Court of Military Review.