UNITED STATES, Appellee,

v.

Private First Class Kenneth E. KARL-
SON, U.S. Army, Appellant.

No. 43,625.

CM 441336.

U.S. Court of Military Appeals.

Nov. 21, 1983.

For Appellant: *Captain Edmund S.
Bloom, Jr.* (argued); *Lieutenant Colonel R.
Rex Brookshire II, Major Lawrence F. Klar*
(on brief); *Colonel William G. Eckhardt,
Major Edwin D. Selby, Captain Donna L.
Chapin* and *Captain Joseph A. Russelburg.*

For Appellee: *Captain Thomas E. Booth*
(argued); *Colonel R.R. Boller, Lieutenant
Colonel John T. Edwards* (on brief); *Colo-
nel James Kucera, Captain Paul K. Cascio*
and *Captain Glenn D. Gillett.*

*Opinion of the Court*

FLETCHER, Judge:

Appellant was tried by a general court-
martial composed of officer members, on
July 1, 1981, at Fort Bliss, Texas. Pursuant
to his pleas, he was found guilty of larceny
of an M16A1 rifle and wrongful communi-
cation of a threat, in violation of Articles
121 and 134, Uniform Code of Military Jus-
tice, 10 U.S.C. §§ 921 and 934, respectively.
The members of his court-martial sentenced
appellant to a dishonorable discharge, con-
finement for 1 year, forfeiture of $344.00
pay per month for 12 months, and reduction
to E–1. Pursuant to a pretrial agreement,
the convening authority approved a bad-
conduct discharge, confinement for 10
months, forfeiture of $334.00 pay per month
for 12 months, and reduction to E–1.[1] The
Court of Military Review affirmed this sen-
tence without opinion.

This Court granted review in appellant's
case on several issues which pertain to the
validity of his sentence.[2] Article 59(a),

---

1. On January 21, 1982, the Commander, Head-
quarters, Combined Arms Center and Fort
Leavenworth, Fort Leavenworth, Kansas, by
means of General Court-Martial Order Number
23, remitted the unexecuted portions of appel-
lant's sentence to confinement, effective Febru-
ary 1, 1982.

2. Granted Issues:

I

WHETHER THE CONVENING AUTHORITY
ERRED TO THE SUBSTANTIAL PREJU-

DICE OF THE APPELLANT BY FAILING TO
ORDER A REHEARING ON SENTENCE ON
THE BASIS THAT THERE WAS A SUB-
STANTIAL RISK THAT APPELLANT'S
SENTENCE WAS TAINTED BY COMMAND
INFLUENCE.

II

WHETHER THE STAFF JUDGE ADVO-
CATE ERRED TO THE SUBSTANTIAL
PREJUDICE OF APPELLANT BY FAILING
TO GIVE APPELLANT'S COUNSEL AN OP-

UCMJ, 10 U.S.C. § 859(a). In general, they concern an allegation that unlawful command influence may have been exerted on the members of his court-martial in their sentencing decision and a complaint that the convening authority and his staff judge advocate improperly resolved this post-trial claim in the Government's favor. See Article 37, UCMJ, 10 U.S.C. § 837.

On July 2, 1981, one day after appellant's court-martial, the same court convened by the Commander, United States Army Air Defense Center and Fort Bliss, Fort Bliss, Texas, was assembled to hear the case of *United States v. Hollowell*, SPCM 16602. Appellant's trial defense counsel represented Hollowell at this court-martial. Prior to the *voir dire* of the members in *Hollowell*, the military judge who had previously presided at appellant's court-martial stated the following:

> The court is now assembled. Members of the Court, before we get into this trial, and before we get into voir dire of the court members, something has been brought to my attention that I think necessitates that I inquire of and ask some questions of certain members of the court outside the presence of the other members. Counsel has brought this to my attention, and I'd like to state for the record, I believe, that I received a phone, at least two phone calls yesterday from a member of the court, which I did not reply to. The reason I did not I was not in the office. So, at this time, Colonel Lindstrom, I'm going to excuse all the other members of the court and I would like to ask you some questions. Will all the other members please be excused, and I'll ask you gentlemen not to speculate or discuss anything at all that you might think this might have to do with. You may be excused.

The military judge then questioned the court member, Colonel Lindstrom, about the subject of these phone calls. He stated:

> MEM(LINDSTROM): There was conversations between members of the court yesterday before we were sworn, that is, while we were waiting for the initial entry into the courtroom. There was the usual banter in the courtroom, however, one of the court members said that he had understood that during a recent commander's call commanders of the 3rd ACR had complained because they did not believe the sentences adjudged by the courts were stiff enough or words to that effect. He further indicated that he thought the certain—that on the next go around of appointing orders there would be more commanders appointed to the courts. There was a couple of other exchanges along the same subject and then that was the end of the conversation on that subject.

MJ: Now, who made this statement?

MEM(LINDSTROM): Lieutenant Colonel Burnette.

MJ: And he said that the 3d CAV had complained about the sentences? Did he say who they complained to?

MEM(LINDSTROM): He led me to believe it was during a meeting called Commander's Call, which is a meeting that General Oblinger, the Convening Authority has on a weekly basis.

MJ: As a result of that complaint it appeared to Colonel Burnette that there would be more commanders on the courts in the cuture [sic]?

MEM(LINDSTROM): Yes, he said that he believed that their command would submit for appointment to the court more commanders. I don't believe these remarks were made in a manner such as to

PORTUNITY TO EXPLAIN OR REBUT ADVERSE INFORMATION CONTAINED IN AN ADDENDUM TO THE REVIEW OF THE STAFF JUDGE ADVOCATE.

III

WHETHER THE STAFF JUDGE ADVOCATE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY FAILING TO APPRISE THE CONVENING AUTHORITY OF THE PROPER LEGAL STANDARD FOR COMMAND INFLUENCE IN HIS "ADDENDUM TO REVIEW OF THE STAFF JUDGE ADVOCATE."

influence the court. I think it was an unfortunate conversation.

MJ: Well, did it influence you at all?

MEM(LINDSTROM): No, it did not and that's why I did not bring it to your attention until after we finished the court yesterday. After I thought about it for awhile I decided that I couldn't speak for others and it should be brought to the attention of the court.

MJ: Now, when I asked you that question I meant did it affect or have any influence on you in the sentencing in the case that you tried yesterday, in the case of *United States versus Karlson*?

MEM(LINDSTROM): No, I don't think so.

The military judge continued his questioning of Colonel Lindstrom concerning the events preceding appellant's court-martial.

MJ: OK. Did you get the impression from this conversation that General Oblinger was dissatisfied with the sentencing?

MEM(LINDSTROM): I did not.

MJ: That the complaint had been raised by the members of the 3d Armored Cavalry?

MEM(LINDSTROM): That's correct.

MJ: And what they intended to do in their selection, I suppose of court members to be submitted to the general for selection on generals and BCD special was to submit the names of more commanders?

MEM(LINDSTROM): Yes, but I was given the understanding that General Oblinger agreed with that.

MJ: He agreed with that?

MEM(LINDSTROM): Yes, sir.

MJ: Do you know whether or not everyone heard this? You may not know this, but was it said loud enough for everyone to have heard it?

MEM(LINDSTROM): Yes, it was said loud.

MJ: Was everyone in there at the time?

MEM(LINDSTROM): Yes.

MJ: All nine members?

MEM(LINDSTROM): Yes, it was after nine o'clock the time we were to assemble.

MJ: And as usual we didn't get you in on nine o'clock?

MEM(LINDSTROM): We weren't keeping a stop watch.

Defense counsel subsequently questioned the court member.

DC: Colonel Lindstrom, was anything said about *Karlson,* about the *Karlson* case, what kind of sentence he should get or anything?

MEM(LINDSTROM): Well, of course, that was part of our deliberation.

DC: I mean at the time you're talking about, this conversation before?

MEM(LINDSTROM): No, the court did not convene at that time.

MJ: You didn't even know what the charges were; did you?

MEM(LINDSTROM): No, we didn't know what the charges were or who Karlson was.

The military judge excused Colonel Lindstrom and called Colonel Burnette to the stand.

MJ: Colonel Burnette, just sit down anywhere if you would. Colonel Burnette, it's been brought to my attention through Colonel Lindstrom that there was some comments made prior to the court convening yesterday while you all were waiting to be convened at the *Karlson* case, *United States versus Karlson,* about dissatisfaction withe [sic] sentences. Would you relate—the comment was attributed to you. Would you relate what, if anything, you said during that period of time?

MEM(BURNETTE): Yes, sir. I can't remember how we got to the topic, sir, but I was told by my commander that on a recent command group discussion that immediate commanders, and I'm talking about squadron and battalion commanders, were not satisfied with the sentences in general, OK, very in general, sir.

MJ: Which command, who was the commander who was conducting this commander's call?

MEM(BURNETTE): General Oblinger, sir.

MJ: OK.

MEM(BURNETTE): Again, I'm getting this second hand, sir, from my commander. That's been my experience also, sir, in my position in the regiment, talking to the squadron commanders that in general they're not satisfied with the sentences.

MJ: Well, what did you relate in this conversation yesterday morning prior to the *Karlson* trial and who did you relate that to?

MEM(BURNETTE): Sir, I'm trying to think back who was sitting at the table at the time and I don't really recall, it might have been most of the panel.

MJ: Colonel Lindstrom indicated that he thought everybody was there, the nine members were present. And do you recall specifically what you said?

MEM(BURNETTE): I think I said words to the effect, sir, that one of the actions we're taking is the names we submit to the JAG for consideration were going to be, in fact, battalion commanders or squadron commanders in our case.

MJ: Now, this was dissatisfaction within the 3d Armored Cavalry Regiment; right?

MEM(BURNETTE): That was not my understanding, sir, just dissatisfaction overall that the sentencing was not of the nature that it should be.

MJ: Now, you indicated that certain squadron commanders and battalion commanders had complained and you got this through your commander. Did you take it that General Oblinger was dissatisfied with the sentences?

MEM(BURNETTE): Yes, sir, that was my understanding.

MJ: In your conversation yesterday morning, did you state, I understand that General Oblinger is dissatisfied with the sentences?

MEM(BURNETTE): I don't believe I did, sir, possibly I could have. It was a very generalized conversation, and again, the point I was trying to make is that we're, in fact, submitting battalion commanders, and in our case, troop commanders to sit as members on the board since they have voiced in general dissatisfaction in the system.

MJ: When was this commander's call alleged to have taken place; do you know?

MEM(BURNETTE): Sir, I think it was the one last month.

MJ: That's in June?

MEM(BURNETTE): Yes, sir.

MJ: Do you remember when Colonel Fitzgerald related this information to you; approximately?

MEM(BURNETTE): Sir, I don't have any idea of the date, it's normally within a couple of days afterwards.

MJ: Now, yesterday, you participated in the sentencing of *Private Karlson,* after having heard the evidence that was presented, and of course he pleaded guilty and you heard evidence in extenuation and mitigation and aggravation, and you were a member of the panel that sentenced him. Did this conversation that you related to the members of the court or apparently you had this information sometime prior to yesterday, did this in any way bring any pressure or influence you to impose a more severe sentence in Karlson's case than you normally would have.

MEM(BURNETTE): Of course not, sir.

MJ: Well, the same thing would apply to the case today, assuming we get to the sentencing phase. Would you feel that there's any undue or any pressure and say, well, the general is dissatisfied so boy we really ought to sock this kid?

MEM(BURNETTE): No, sir, of course not. Sir, quite frankly, the squadron commanders within my unit have talked to me about this in the past and I'm sure I'm influenced by them also, but, when I say influenced they have in fact talked to

me but my duties sitting on a panel in a court I have to use my own judgment.

MJ: I'm not hammering at you, I'm just asking questions that need to be asked under the circumstances and I'm not questioning your integrity whatsoever. All right. Do you recall in this little conversation yesterday morning whether or not there were any other court members who said, yes, I heard of that too; do you recall?

MEM(BURNETTE): No, sir, I do not recall.

MJ: Do you recall any responses that were made to your comment, that well, this is what we're going to do, we're going to submit more commanders as court members? Did anybody comment on that or say anything?

MEM(BURNETTE): Well, keeping in mind, sir, that the 3d ACR, Lieutenant Colonels, other than the Regimental XO, there are no Lieutenant Colonels other than commanders also, no, sir.

TC: Sir, I just got one or two questions for Colonel Burnette and I think I can save the rest for the court. Colonel Burnette in your conversations with Colonel Fitzgerald, did you feel that his conversation with General Oblinger that it was directed to apply pressure to this court or something for the next court that they were trying to do?

MEM(BURNETTE): No. Again, in my year and a half in this particular unit and previous to me serving on this panel when I used to review the court case in my functions as a Regimental XO, it has been my experience that squadron commander and troop commanders were not satisfied with some of the sentences. In all honesty, that doesn't mean I agreed with them in all cases, as we all know there is always two sides and sometimes they're not privy to what happens in this courtroom and I'm the first one to realize that. So, I'm sure that's part of it. But that is the general consensus with the first line supervisors, quite a few of my first line supervisors in my unit, and I'm not so sure that that's so different from

any other unit that I've served in also, sir, and other installations.

The remaining members of the court-martial panel were then individually called by the military judge. Colonel Crosby and Major Thornton, who passed sentence on appellant, acknowledged that Colonel Burnette had commented that the squadron and battalion commanders expressed dissatisfaction with court-martial sentences at an officer's call held by General Oblinger, and suggested the appointment of more commanders to courts-martial. They stated that it was their impression that the subordinate commanders were upset, not General Oblinger, and these comments did not influence their sentencing decision in appellant's case. Captain Escobar, who had been challenged from appellant's court, agreed. Colonel Keene, Major Ramick, and Warrant Officer Hamilton denied for various reasons that they heard such a comment. Major Hines, who was also successfully challenged from appellant's court-martial, acknowledged that he heard Colonel Burnette's comment and had the impression that General Oblinger was the source of this dissatisfaction.

The military judge then made the following statements:

MJ: Gentlemen, I think that this voir dire that I've conducted would indicate that some of the Court members heard this conversation; others did not, and that even though two of them—I think Colonel Burnette and Major Hines may have gotten the opinion that the General was upset about this. They nevertheless indicated that that did not in any way— well Colonel Burnette indicated it did not in any way affect his sentence in the Karlson case, and both of them indicated that it would not affect any—their ability to hear this case today. While it's rather unusual, I don't feel that these Court members are precluded from sitting as members of the Court. I'll be glad to hear argument either for or against—either specifically or generally, as a panel.

TC: Your Honor, apparently this matter was not as serious as I anticipated it

was from my conversation with Colonel Lindstrom. Colonel Lindstrom—it was his concern that just the mere discussion of this would somehow affect their ability to sit.

MJ: Well, I think he was very right in doing what he did.

TC: But actually ...

MJ: I don't know—it might have been better for him to have done it at the time—before we started the sentencing phase on Karlson. Now I suggest that what you do—I don't know how you do this, but I see no reason why—well, that's going to have to be something that you all are going to have to work out, but as far as the record of trial in this case is concerned, I think my questions have answered some of the questions that would have been raised in the Karlson case. Now how you marry the two up is going to be up to you all. I don't know—we might talk about that later on.

The staff judge advocate in his post-trial review in appellant's case made no mention of the above matters. Defense counsel in his response to this post-trial review notified the convening authority of the above mentioned occurrences and requested an appropriate reduction in appellant's sentence. An addendum to the staff judge advocate's initial review was prepared by a different acting staff judge advocate. He outlined the testimony of each of the court members and concluded that the presumption of influence in the Karlson case was overcome by the trial counsel's and the military judge's intensive voir dire. The convening authority, Major General John B. Oblinger, approved the sentence as provided in the pretrial agreement.

Since the aftermath of World War II, Congress has clearly recognized that unlawful command influence on the members of a court-martial has a pernicious effect not only on military justice but on discipline and morale as well. E.g., Hearings on H.R. 2575 Before a Subcommittee of the House Armed Services Committee, 80th Cong., 1st Sess., 2125–26 (1947); Hearings on H.R. 2498 Before a Subcommittee of the House Armed Services Committee, 81st Cong., 1st Sess., reprinted in Index and Legislative History, Uniform Code of Military Justice 608, 1019–21 (1949). Accordingly, Congress has repeatedly prohibited such conduct. Article 37; and Article 98, UCMJ, 10 U.S.C. § 898; Article of War 88 (1948). In addition, it is well established that unlawful command influence may assume many forms, may be difficult to uncover, and affects court members in unsuspecting ways. See generally H. Moyer, Justice and the Military, § 3–100—§ 3–400 (1972).

The initial question which must be addressed in this case is whether the record before us is adequate for the resolution of appellant's post-trial claim of unlawful command influence. See United States v. DuBay, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). The Government asserts that appellant has already received a hearing on his allegation and a trial judge has ruled against him. Several startling observations must be made concerning this argument. First, appellant was not present at this hearing. Cf. Article 39(b), UCMJ, 10 U.S.C. § 839(b). Second, defense counsel was representing Hollowell at this trial, not appellant. Cf. Article 27(a), UCMJ, 10 U.S.C. § 827(a). Third, neither General Oblinger, Colonel Fitzgerald, nor any of the commanders who were present at the challenged officer's call testified concerning appellant's allegations. Cf. Article 46, UCMJ, 10 U.S.C. § 846. Fourth, the decision on appellant's post-trial claim of command influence was made by General Oblinger, the convening authority who had an official and personal interest in this matter. Cf. United States v. DuBay, supra.

The seriousness of appellant's contentions and the matters he has adduced in support thereof convince us that the disposition ordered in United States v. DuBay, supra, is appropriate. The decision of the United States Army Court of Military Review as to sentence is reversed. The record of trial is returned to the Judge Advocate General of the Army for action in accordance with that decision.

Chief Judge EVERETT and Judge COOK concur.